COMMONWEALTH vs. WARREN W. DOUGAN
(and nine companion cases[1]).

Suffolk. November 8, 1978. — February 14, 1979.

Present: QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Evidence*, Relevancy and materiality, Cross-examination. *Practice,
Criminal*, Comment by prosecutor. *Witness*, Cross-examination, In-
timidation. *Identification*.

At a criminal trial of three defendants charged with kidnapping,
armed robbery, and other offenses, there was no error in admitting
testimony on redirect examination that the victim's apartment had
been ransacked a few weeks after the crimes, that an unidentified
car had whizzed by the male victim as he was crossing the street,
and that on another occasion a yellow Mustang automobile had run
the male victim's motorcycle off the road where the defense, on
cross-examination, had pursued the issue of the victims' delay in
reporting the crimes to the police and where the evidence was
relevant to the victims' state of mind and reasons for the delay.
[306-309]

Where the defendants in a criminal case were permitted extensive
cross-examination of one of the victims as to the relationship be-
tween his testimony and his arrest by Federal authorities on gun
dealing charges, there was no abuse of judicial discretion requiring
reversal in the exclusion of a question as to whether the victim had
known the maximum penalty possible for the firearms offense to
which he had pleaded guilty and received a two-year suspended
sentence. [309-310]

Although the prosecutor in a criminal case exceeded the limits of
proper argument, the argument was not so harmful to the defend-
ants' rights as to require reversal of their convictions. [311-312]

The judge at a criminal trial erred in refusing to allow defense counsel
to explore the circumstances surrounding the victims' identifica-
tion of one of the defendants. [312-318]

---

[1] Of the companion cases, three are by the Commonwealth against
Warren W. Dougan, three are against Robert R. Linehan, and three
are against Fred M. Woodard.

INDICTMENTS found and returned in the Superior Court on September 10, 1974.

The cases were tried before *Roy*, J., and a motion by the defendant Linehan for a new trial was heard by him.

After review by the Appeals Court of the cases against the defendants Dougan and Linehan, the Supreme Judicial Court granted the Commonwealth leave to obtain further appellate review. The defendant Woodard was permitted to file a late claim of appeal in this court.

*Michael J. Traft*, Special Assistant District Attorney (*Philip T. Beauchesne*, Assistant District Attorney, with him) for the Commonwealth.

*Susan J. Baronoff* for Warren W. Dougan.

*J. Russell Hodgdon* for Fred M. Woodard.

*Ann Lambert Greenblatt* for Robert R. Linehan.

QUIRICO, J. These three defendants were tried jointly on several indictments arising out of an incident in which one James Lopes was kidnapped and beaten, his girl friend Maryanne Connolly, now his wife, was raped in his presence, and several items were stolen from their home. The defendant Dougan was convicted of kidnapping, armed robbery, rape, and commission of an unnatural act, the defendant Linehan of kidnapping, armed robbery, and rape, and the defendant Woodard of kidnapping, armed robbery, and assault and battery by means of a dangerous weapon. On appeal, the convictions of Dougan and Linehan were reversed by the Appeals Court on several grounds (*Commonwealth* v. *Dougan*, 6 Mass. App. Ct. 420 [1978]), and their cases come before this court on the Commonwealth's application for further appellate review. Woodard failed to file a timely claim of appeal, but after the reversal of his codefendants' convictions, a single justice of this court allowed his petition to file a late claim of appeal, and that appeal has been consolidated with the appeal of Dougan and Linehan.

We are asked to review three claims of error that relate to all three defendants: First, that the trial judge erred in admitting evidence of several criminal incidents occur-

ring after the date of the crime for which the defendants were being tried; second, that the judge unduly restricted the scope of the defendants' cross-examination of Lopes; and third, that comments made by the prosecutor in closing argument constituted reversible error. For the reasons set forth below, we hold, contrary to the opinion of the Appeals Court, that there was no error as to any of these grounds. A fourth claim of error applies solely to the defendant Linehan, and concerns several rulings relating to the handling of identification testimony before and during trial. On this issue we reverse the judgments against Linehan.

The Commonwealth's case consisted primarily of the testimony of the victim James Lopes and Maryanne Connolly who testified as follows. On March 29, 1974, Connolly was at home with her young son when Woodard and another man named Giers[2] came to visit. Connolly and Lopes had known both men for over a year through association with a motorcycle club[3] to which Woodard and Giers belonged, and in which Lopes had been a probationary member. When Lopes arrived home from work about an hour later, the three men had a couple of beers and talked, until suddenly Woodard stood up, pulled a gun on Lopes, and announced that "he'd come to kidnap" him. Holding guns to Lopes's back, Woodard and Giers forced him outside into a waiting car and drove him across town to a house belonging to Linehan. There Lopes was made to lie face down on a bed and Dougan, whom Lopes also knew as a member of the motorcycle club, accused him of making certain telephone calls to his girl friend, and slapped him several times. Dougan, Linehan and Giers then drove Lopes back to his apartment (Woodard re-

---

[2] Giers, who was indicted with the other defendants, did not appear for trial and was defaulted.

[3] This club was known as the "Devil's Disciples," but no mention of the name was permitted during trial on account of its prejudicial effect.

maining behind), tied him up with wire and tape, and hit him in the chest. Dougan and Giers ordered Connolly into the bedroom and forced her to have intercourse and commit fellatio. At some point, Dougan and Linehan dragged Lopes, still bound, into the bedroom to witness these acts; Linehan commenting that Connolly was lucky that he did not want to do it too. After these acts of rape, Giers and Dougan beat Lopes until he lost consciousness, and they left with Linehan. When Lopes regained consciousness five or ten minutes later, he and Connolly dressed and went to a hospital, where Lopes was treated in the emergency room. When they returned home at about 1 or 2 A.M., Connolly called her father and told him what had happened. He testified to that telephone call in corroboration of the victim's claim of fresh complaint.

1. *Evidence of other crimes.* The defendants presented no evidence, their primary defense being that the incident had never occurred. In support of this theory, they relied heavily on the fact that Lopes and Connolly had made no report about the incident to the police until after Lopes was arrested on June 29, 1974, by Federal agents for handgun dealing. To explain this delay, the Commonwealth sought to introduce testimony from Lopes and Connolly about threats and violence that occurred against them after the March 29 incident which later acts deterred them from going to the police. The defendants moved before trial to have such evidence excluded, and the judge agreed to hold a voir dire on it when it arose during the trial. When the prosecutor attempted to refer to such incidents in his opening statement, the judge sustained the defendants' objections to his remarks.

On direct examination Lopes testified without objection that the reason he had waited so long to tell the police about the incident was that "I was in hiding from these people." He also testified, again without objection, that he had moved to a new apartment three weeks after the incident, and that he had to move from that apartment about a month and one-half later because somebody

broke into it and "cleaned it out." Two weeks after that, according to his testimony, he was put under police protection. The prosecutor then asked him about a further incident involving a yellow Mustang automobile and the defendants objected. At a bench conference, the prosecutor made an offer of proof that Lopes would testify he was run off the road, while riding his motorcycle, by a yellow Mustang automobile, and that Connolly would testify that she had seen such a Mustang automobile being driven by Giers on another occasion. The judge, although finding such evidence relevant to the victims' state of mind and lack of fresh complaint, ruled that he would exclude it at that time but allow it in on redirect if the defendants pursued those issues on cross-examination.

During cross-examination Lopes was indeed questioned about his delay in reporting to the police. Therefore on redirect the judge permitted him to testify about three incidents which he stated had caused him to change his mind about reporting to the authorities: one, the robbery of his apartment which he had testified to on direct; two, an occasion when an unidentified car whizzed by him as he was crossing the street; and three, an occasion when a yellow Mustang automobile ran his motorcycle off the road. The defendants took exception to all of this testimony.

Connolly testified that she did not go to the police at first "because they had threatened me" and that she changed her mind because "I just got tired of running." The defendants made no objection to this line of testimony until the prosecutor asked the witness about specific incidents that affected her state of mind with regard to speaking to the police. In response to a defense objection at that point, and on the prosecutor's representation that this testimony would be corroborative of what Lopes had testified to previously, the judge excluded the answer to the question on the ground that the evidence had already been admitted.

The Appeals Court held that since "[t]here was no showing that either defendant had ransacked the apartment of the male victim . . . or had attempted to run him off the road," 6 Mass. App. Ct. 420, 421 (1978), it was error to admit such evidence. We first note that no defendant objected to the testimony about the ransacking of the apartment when it was originally offered, and therefore we are faced with no issue concerning that testimony on appeal. *Commonwealth* v. *Coleman,* 366 Mass. 705, 710 (1975). *Commonwealth* v. *Underwood,* 358 Mass. 506, 508-509 (1970). But even assuming that exceptions were properly saved to the testimony of that incident as well as to the car incidents, we find no error in the judge's ruling admitting them. These incidents were relevant to the victims' state of mind and reasons for the delay in making a complaint, and for this purpose no evidence linking them to the defendants was necessary. A closely analogous situation arose in the case of *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 415 (1978), where the defendants objected to the admission of evidence concerning a bullet which a witness found outside her door sometime after the alleged assault. We held that "[t]he evidence concerning this incident, with its strong implication that [the witness] was being threatened concerning her testimony, did not become improper simply because it was not linked to the defendants." Nor would a different result be required if this evidence were linked directly or by implication to the defendants. Although evidence of other crimes cannot of course, be admitted as tending to prove the commission by the defendants of the crime charged, *Commonwealth* v. *Stone,* 321 Mass. 471, 473 (1947), such evidence can be admitted for other relevant purposes including the explanation of a witness's fear of going to the police or testifying. *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 816 (1973). *Commonwealth* v. *Douglas,* 354 Mass. 212, 225 (1968), cert. denied, 394 U.S. 960 (1969). *United States* v. *Cirillo,* 468 F.2d 1233 (2d Cir. 1972), cert. denied, 410 U.S. 989 (1973).

In this case, the judge took steps to minimize any prejudicial impact from the testimony. He did not permit the prosecutor to allude to these incidents in his opening statement. He did not allow Lopes to testify about them on direct examination, waiting instead to see what would develop during cross-examination. He did not permit Connolly to testify about them during her direct examination, so that the jury only heard about them once. Only on the redirect examination of Lopes, after the defense, on cross-examination, had pursued the issue of delay in reporting, was there any testimony about these incidents. We have pointed out before that as a general rule witnesses should have the opportunity to explain on redirect why they did or did not do certain things which were the subject of questioning on cross-examination. *Commonwealth* v. *Ferreira*, 373 Mass. 116, 130-131 (1977). *Commonwealth* v. *Fatalo*, 345 Mass. 85 (1962). *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952). In any event, the victims were allowed to testify without objection that they were "in hiding from these people," that they had been threatened, and that they had been placed under police protection. It is highly unlikely that the brief testimony about the two automobile incidents could have significantly altered the image already received by the jury.[4] In view of the relevance of this testimony, we cannot say that the judge erred in admitting it.

2. *The scope of cross-examination.* In their cross-examination of Lopes, the defendants sought to bring out the relationship between his testimony and his arrest by Federal authorities on gun dealing charges. The Commonwealth objected to this line of questioning when it first arose, but the judge overruled the objection, allowing the defendants to "bring out the whole situation." Lopes was

---

[4] The defendants contend that the prejudice suffered by them as a result of admission of the evidence of "other crimes" was compounded by the prosecutor's remarks in closing argument. We consider this claim further in part 3 of this opinion.

then questioned at some length about his arrest, indict-
ment, guilty plea, and sentencing and his contact with
Federal and State authorities. He was asked several
times about the possibility that he had been promised
consideration in exchange for information about the mo-
torcycle club or his testimony at trial, which he denied.
On recross-examination, defense counsel asked Lopes if
he had known the maximum penalty possible for the
firearms offense to which he pleaded guilty and for which
he had received a two-year suspended sentence. Although
the Commonwealth did not object, the judge excluded this
question. The defendants claim this exclusion was an
abridgement of their constitutional right to cross-exami-
nation. *Davis* v. *Alaska*, 415 U.S. 308, 316-317 (1974).

The defendants are entitled, as of right, to reasonable
cross-examination of a witness for the purpose of showing
bias, particularly where that witness may have a motiva-
tion to seek favor with the government. *Alford* v. *United
States*, 282 U.S. 687, 693 (1931). *Commonwealth* v. *Fer-
rara*, 368 Mass. 182, 189 (1975). *Commonwealth* v. *Michel*,
367 Mass. 454, 459 (1975). However, the trial judge still
has discretion to control the scope of the examination. In
this case, it might have been preferable, especially in
view of the lack of objection by the Commonwealth, to
permit the excluded question. However, since the jury
had already been adequately exposed to the issue by the
extensive questioning during cross-examination, we can-
not say this ruling constituted an abuse of judicial discre-
tion requiring reversal. *Commonwealth* v. *Walker*, 370
Mass. 548, 572, cert. denied, 429 U.S. 943 (1976). *Common-
wealth* v. *Flemmi*, 2 Mass. App. Ct. 533, 544-546 (1974),
habeas corpus denied sub nom. *Flemmi* v. *Gunter*, 410
F. Supp. 1361, 1371 (D. Mass. 1976). *Commonwealth* v.
*Dominico*, 1 Mass. App. Ct. 693, 714 (1974).[5]

---

[5] Cf. *Commonwealth* v. *Ahern*, 370 Mass. 283, 287 (1976); *United
States* v. *Mayer*, 556 F.2d 245 (5th Cir. 1977), where convictions were
reversed when the judge excluded *all* questions regarding possible
bias of witnesses arising from other cases.

3. *The prosecutor's final argument.* The defendants argue that several comments made by the prosecutor in final argument constituted reversible error, either because they referred to matters not in evidence or because they were improper comment on the characters of the accused. These remarks are set out in full in the margin.[6]

The defendants did not object at the time to the comments about the victim having been "hounded . . . from pillar to post," and the specific incidents referred to—the ransacking of the apartment, the threats, the running off the road—had been admitted, and we hold properly admitted in evidence. The comment about Lopes's telephone call—which the defendants did object to, and which was not based on any evidence—was immediately followed by the judge's curative instruction to the jury that "[t]he arguments of counsel are not facts in the case, not evidence" and his admonition to disregard any comments not consistent with the jury's memory of the evi-

---

[6] "Well, I can suggest to you—and I think you could reasonably find—that he [Lopes] came to a point in his life where he had to make a decision. He no longer could run with this motorcycle gang. They had hounded him from pillar to post, according to the testimony here from the stand. There was evidence that his apartment had been ransacked. There was evidence that if he went to the police, that he and his wife would be killed. There was evidence that he'd been run off the road on at least one occasion. It's for you to say whether or not this man had come to the end of the line when he finally told the story.

"You're not dealing with your average citizen when you're dealing with a motorcycle gang [objections by all defendants]. You can use your own good common sense as to whether or not the Marquis of Queensbury would be found amongst members of a motorcycle gang. You can decide whether or not, in your experience, a story like this of rape and unnatural acts with an infant present—is that consistent with the type of behavior that you'd expect from the type of people that participate in motorcycle gangs? That's for you to say.

. . . .

"Do you think it would be consistent with your assessment of Lopes that he might call, even though he denied to you—that he might call a young girl who was getting involved with a motorcycle gang and perhaps tell her that she was going in the wrong direction [objections by all defendants]?"

dence. The remarks about the nature of a motorcycle gang were not much different from comments previously made by one of the defense counsel who stated "with regard to the people concerned in this case on both sides, you're not going to run into any of them at your local P.T.A. meeting . . . ." Despite the earlier ruling that the name "Devil's Disciples" should not be mentioned, the jury had heard enough other evidence about the motorcycle "club" to be aware that this organization was in fact a motorcycle "gang."

The task of this court is to assess on exceptions by the defendants whether the argument as a whole is prejudicial in light of all the circumstances, including the nature of the evidence, the persistence or flagrancy of the remarks, and the instructions of the judge. *Commonwealth* v. *Earltop,* 372 Mass. 199, 203-204 (1977). *Commonwealth* v. *Borodine,* 371 Mass. 1, 9 (1976), cert. denied, 429 U.S. 1049 (1977). *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 316 (1973). Here, the prosecutor emphasized that the final judgment was up to the jury, not to him ("I think you could reasonably find . . .," "It's for you to say . . .," "You can decide . . . .," "That's for you to say . . ."); and he refrained from inflaming the jurors' fears or emotions, or suggesting that he was privy to evidence not admissible at trial which convinced him of the defendants' guilt. The judge cautioned the jury that sympathy, prejudice, and animosity had no place in their deliberations. While we do not condone the prosecutor's behavior in this case in exceeding the limits of proper argument, neither do we believe that in context it was so harmful to the defendants' rights as to merit reversal of their convictions. See *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 416-424 (1978).

4. *Issues concerning the identification of Linehan.* Alone among the three defendants, Linehan contended that his arrest and conviction were the result of mistaken identity, and that he was not present when the alleged crimes were committed. Although in his presentation to

the jury Linehan's counsel, Mr. Charles Clifford, also relied, with the codefendants' counsel, on a defense that the crime had never occurred, he was unequivocal in trying to alert the judge even prior to trial to his sincere belief that an error had occurred in identification and that some curative steps should be taken. At a pretrial conference on the morning set for trial, Mr. Clifford stated, "I honestly believe my client, your Honor, that he was not there, and I think it's a case of honest mistake on the victim's part." Nonetheless, as we shall see, the judge denied his every attempt to explore the circumstances surrounding the identification of Linehan.

The validity of the identification was thrown into question by several factors, none of which, unfortunately, was ever properly explored on the record. First, there was a question as to how Linehan was initially identified to the police. The Commonwealth had assured Mr. Clifford that the victims knew Linehan, and had named him to the police as the fourth man involved, but just before trial a police officer told the defense counsel that in fact a photographic identification had occurred. At a lobby conference before trial, the prosecutor informed the judge that he had just learned that Lopes had selected Linehan's picture from a photographic spread; until then he "had always been informed that they all [the victims and Linehan] knew each other."[7] Based on this last minute information, Mr. Clifford moved to dismiss the case, arguing that the Commonwealth had wilfully withheld exculpatory evidence, and that he would have prepared the case differently if he had known that there had been photographic identification. This motion was denied, as was his motion to show a photographic spread to the victims, have a lineup, or seat Linehan among the spectators to test the victims' identification of him. The Commonwealth stated that it would not use the photographic

[7] On cross-examination, Lopes confirmed in answer to a question by Mr. Clifford, that he had been shown photographs by a detective.

identification as part of its case, and the judge agreed to consider a motion for voir dire on the issue of the identification of Linehan when it arose during trial. Mr. Clifford made a motion for such a voir dire when Lopes took the stand, but the judge denied it.

The prosecutor's representation that the victims had identified Linehan on the basis of their previous knowledge of each other was further thrown into doubt by the victims' testimony on cross-examination. Lopes testified that he only knew Linehan by the nickname "Lennie," and that he had only seen "Lennie" on two very brief occasions prior to the March 29 incident, when he passed by him in a hallway. Connolly testified that she had only seen Linehan "[m]aybe once" before March 29, and only knew him by the nickname "Lennie." There was some implication that Linehan may not even have been a member of the motorcycle club; in any event Lopes testified that as far as he knew Linehan was not, nor had Lopes ever seen Linehan in the company of Dougan, Woodard, Giers or any other club member.

It was Mr. Clifford's contention that the fourth man involved was in fact not Linehan, but another unidentified look-alike member of the motorcycle club, whose photograph Mr. Clifford had somewhat mysteriously obtained and which he wished to show to the victims. The Commonwealth was agreeable to having this photograph shown to Lopes on voir dire but the judge excluded it, even when offered out of the presence of the jury, unless it was developed by further evidence who the man depicted in the photograph was, and whether he was a member of the motorcycle club.

Mr. Clifford never produced any such evidence at trial, but at a new trial hearing a year and one-half later he brought the mysterious man in the photograph forward as a witness for Linehan. The man was one Robert Hayes, by his own admission a member of the Devil's Disciples at the time of the kidnapping, a very close friend of Linehan's, and also by his own admission the fourth man who

participated in the March 29 incident with Dougan, Woodard, and Giers. At the time of the new trial hearing, Hayes was under indictment for murder in the first degree in New Hampshire. Mr. Clifford argued once again that Linehan was not the man who participated in the March 29 incident, that he was not, in fact, a member of the motorcycle gang, and that his hands had been tied in presenting these matters at trial because of limitations which Hayes had imposed on the use of the information about himself at that time.

At the hearing on the motion for a new trial, Hayes testified about his prior contacts with Mr. Clifford and about why he had finally come forward. He described his part in the March 29 events in some detail. After hearing this testimony, the judge denied the new trial motion, finding that Hayes's version of the events was inconsistent with the testimony of Lopes and Connolly,[8] that the murder charge against him gave him a motive for exonerating his good friend Linehan, and that he and Linehan were not "look-alikes" even though both had had beards at the time of the crime. The judge also made a finding that there had been no prior out-of-court photographic identification of Linehan, although the only reference to this issue at the new trial hearing was in Mr. Clifford's argument, when he hypothesized that the police showed Lopes a photograph of Linehan, whom they knew to be the owner of the house to which Lopes was taken, and Lopes said, "[T]hat's the man." The Commonwealth never confirmed or denied whether such a photographic identification had occurred.

The finding that there had been no prior out-of-court photographic identification was plainly in error, since no evidence had ever been introduced at either the trial or

---

[8] Examples of such inconsistencies included Hayes's testimony that Lopes had never been tied up, that he saw no one engage in any sexual acts with Connolly, and that there was a "big dog" present in Lopes's apartment.

the hearing on the motion for a new trial which would support such a finding. What little evidence there is on the record in fact points in the opposite direction. Yet resolution of this question must logically precede resolution of the other claims made by Linehan in regard to the identification process. Until there have been careful findings, supported by the evidence, as to what identification procedures did in fact occur, it is impossible to determine if those procedures, or the in-court identifications, or the judge's rulings on Linehan's motions, violated his due process rights.

It is undeniable that a defendant has a due process right to identification procedures meeting a certain basic standard of fairness. *Stovall* v. *Denno*, 388 U.S. 293, 301 (1967). *Simmons* v. *United States*, 390 U.S. 377, 384 (1968). *Commonwealth* v. *Clifford*, 374 Mass. 293, 303-304 (1978). This right would mean little if it did not carry with it the right to be informed of the details of any out-of-court identification, even if it were not used at trial. This is because the prosecution could then rely on a seemingly unimpeachable in-court identification, with the defendant sitting conspicuously at the defense table or in the dock, without ever revealing to defense counsel or the jury the perhaps egregiously suggestive procedures which had caused the defendant to be linked to the crime in the first place. The suggestiveness of such pretrial procedures, and their impact on the eyewitnesses' perceptions of the defendant, may be the defendants' sole means of attack on what otherwise appears to be an unshakable in-court identification. *United States* v. *Wade*, 388 U.S. 218, 240-241 (1967). *Manson* v. *Brathwaite*, 432 U.S. 98, 113 n. 14 (1977). *Commonwealth* v. *Jones*, 375 Mass. 349, 355 (1978). *Commonwealth* v. *Funderberg*, 374 Mass. 577, 582 (1978). *Commonwealth* v. *Barnett*, 371 Mass. 87, 94 (1976), cert. denied, 429 U.S. 1049 (1977).

We have recently emphasized and here repeat that full exploration of the circumstances surrounding eyewitness identification is necessary to ensure a fair trial. *Common-*

wealth v. Dickerson, 372 Mass. 783-789 (1977): "Since eyewitness identification often plays a major, if not a determinative, role in the trial of criminal offenses, and the dangers of mistaken identification are great and the result possibly tragic, defendants must be allowed to examine fully during the voir dire hearing the totality of circumstances . . . . In a case suggestive of unfairness in the confrontation process, failure to allow full development of the circumstances surrounding the identification might well warrant setting aside the verdict of guilt" (emphasis in original). In this case, Linehan was denied any opportunity to explore the identification process, or even to be informed accurately by the Commonwealth as to what identification procedures were used. Yet the identification issue was central to his conviction—there was absolutely no evidence other than the victims' identification of him connecting him even circumstantially to the crime.

In these circumstances, we reverse the judgment against Linehan and set aside the verdicts of guilty as to him. In the event of a retrial, there should be a voir dire hearing at which all the circumstances surrounding the pretrial identification of Linehan can be developed. United States v. Wade, supra at 242. Commonwealth v. Mendes, 361 Mass. 507, 511 (1972). In the event, as the record suggests, that there was photographic identification of Linehan, the defendant will have the opportunity to be heard on whether it was suggestive, Simmons v. United States, 390 U.S. 377, 384 (1968), and if suggestiveness is proved, the trial judge can determine the issues of reliability and fairness of the identification. See Manson v. Brathwaite, 432 U.S. 98 (1977); Commonwealth v. Nolin, 373 Mass. 45, 51 (1977); Commonwealth v. Botelho, 369 Mass. 860, 871 (1976); Commonwealth v. Mendes, supra. Depending on what is revealed at the voir dire, the defendant may or may not wish to renew his motions to hold an in-court lineup, photographic spread or to seat himself among the spectators at trial. We reiterate our

settled policy that the granting of such requests lies within the discretion of the trial judge. *Commonwealth* v. *Pearsall,* 370 Mass. 413, 415-416 (1976). *Commonwealth* v. *Core,* 370 Mass. 369, 372-373 (1976). *Commonwealth* v. *Jones,* 362 Mass. 497, 501 (1972). However, in exercising that discretion the judge should have the benefit of knowledge of all the relevant facts concerning the disputed identification. If there is a retrial, and a voir dire on identification, the judge can reassess the admissibility of the photograph of Hayes when and if the question arises in the circumstances then existing. If the circumstances then existing are substantially the same as shown by the evidence at the hearing on the motion for a new trial, the photograph would appear to be admissible on the issue of the identification of Linehan.

5. Linehan's final assignment of error, based on the judge's rulings on the sequestration of witnesses, furnishes no additional ground for reversal, because the judge's rulings fell within the range of his discretion. *Commonwealth* v. *Watkins,* 373 Mass. 849, 850-851 (1977). *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 748 (1975). At any retrial, the judge can reassess any motion for sequestration of the witnesses that is again presented.

6. As to the defendants Dougan and Woodard, the judgments of the Superior Court are affirmed. As to the defendant Linehan, the judgments of the Superior Court are reversed and the verdicts set aside.

*So ordered.*