Joseph NIZIOLEK, Jr., Petitioner,
Appellant,

v.

Michael ASHE, et al., Respondents,
Appellees.

No. 82–1305.

United States Court of Appeals,
First Circuit.

Argued Sept. 16, 1982.

Decided Nov. 24, 1982.

John M. Thompson, Springfield, Mass., for petitioner, appellant.

William D. Luzier, Jr., Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Stephen R. Delinsky, Asst. Atty. Gen., Chief, Criminal Bureau, and Barbara A.H. Smith, Asst. Atty., Gen., Chief, Criminal Appellate Division, Boston, Mass., were on brief, for respondents, appellees.

Before COFFIN, Chief Judge, DAVIS * and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Petitioner-appellant Niziolek appeals from a judgment of dismissal entered by the United States District Court for the District of Massachusetts denying his petition for a writ of habeas corpus. The petition asserted nine grounds for relief. The district court first dismissed one ground (No. 8), a *Brady-Giglio* claim, for failure of exhaustion. In a detailed and comprehensive opinion, the court found that petitioner had failed to substantiate his eight other claims. In his brief to this court, petitioner has chosen not to pursue three of the grounds for relief (Nos. 2, 5, and 7) contained in his original petition and presented to the district court. These claims for relief are deemed abandoned. *See Red v. Blackburn,* 636 F.2d 1027, 1028 (5th Cir.1981) (per curiam).

I

The petition filed before this court contains five exhausted claims and one unexhausted claim—a "mixed" petition. The first issue, therefore, is the applicability of *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

In the course of the district court proceedings, the Commonwealth did not object to the court's consideration of the exhausted claims. After the case was submitted to the district court, but before the opinion issued on March 9, 1982, the Supreme Court, on March 3, 1982, handed down its decision in *Rose v. Lundy.* This decision, which adopted a "total exhaustion" rule, has changed established First Circuit procedure. Prior to *Rose,* district courts within the First Circuit considered the merits of the exhausted claims in a mixed habeas petition and dismissed the unexhausted claims.[1] *Katz v. King,* 627 F.2d 568, 574 (1st Cir.1980); *Miller v. Hall,* 536 F.2d 967, 969–70 (1st Cir.1976). In this case it would appear that neither the district court nor the parties were aware of *Rose,* which, considering the respective dates, is understandable.

---

* Of the Federal Circuit, sitting by designation.

1. Prior to *Rose,* only two courts of appeals, the Fifth Circuit and the Ninth Circuit, had adopted a "total exhaustion" requirement. *See Galtieri v. Wainwright,* 582 F.2d 348, 355–60 (5th Cir. 1978) (in banc); *Gonzales v. Stone,* 546 F.2d 807, 808–10 (9th Cir.1976).

Rose holds that the exhaustion rule of 28 U.S.C. § 2254(b), (c) requires a federal district court to dismiss a petition for a writ of habeas corpus if it contains any claims not exhausted in the state courts. This rule of total exhaustion precludes district court consideration of the exhausted claims contained in a mixed petition; the district court must dismiss such a petition in its entirety. After dismissal, the petitioner is left with a choice: return to the state courts to exhaust all claims or resubmit an amended petition presenting only the exhausted claims. 455 U.S. at 510, 102 S.Ct. at 1199.

By choosing to amend the petition so as to exclude the unexhausted claims, a petitioner does not automatically waive the right to pursue these claims at a later time. If the amended petition is denied by the district court, the petitioner may return to the state courts to seek state relief in connection with the unexhausted claims. Once all state remedies are exhausted, the petitioner is free to file a second habeas petition in the federal district court asserting these claims as new grounds for relief.

In Part III–C of her opinion in Rose—a section joined only by a plurality of the Court—Justice O'Connor indicates that a prisoner who chooses to amend, rather than complete exhaustion, risks forfeiting consideration of his or her unexhausted claims in the federal courts. A district court faced with a second habeas petition may dismiss pursuant to 28 U.S.C. § 2254 Rule 9(b), if it finds that "the failure of the petitioner to assert those [new] grounds in a prior petition constituted an abuse of the writ." 455 U.S. at 521, 102 S.Ct. at 1204 (quoting 28 U.S.C. § 2254 Rule 9(b)). Justice Brennan, dissenting from Part III–C of the opinion,

concluded that, absent unusual circumstances, the remedy of dismissal for abuse of the writ cannot be employed against a second habeas petition. 455 U.S. at 532, 102 S.Ct. at 1210 (Brennan, J., concurring in part and dissenting in part).[2]

■ We do not believe that Rose establishes the exhaustion rule contained in 28 U.S.C. § 2254(b), (c) as a jurisdictional requirement. Rose is not phrased in jurisdictional terms; it does not indicate that either the Constitution or Congress has directly confined the federal courts' power over habeas cases. Further, the Court explicitly states that the text of § 2254 does not compel a "total exhaustion" rule and admits that "in all likelihood Congress never thought of the problem [of mixed petitions]." 455 U.S. at 516, 102 S.Ct. at 1202. The Court adopts the "total exhaustion" rule because it "promotes comity and does not unreasonably impair the prisoner's right to relief." 455 U.S. at 522, 102 S.Ct. at 1205. This is not the language of a jurisdictional mandate. We, therefore, reaffirm the First Circuit position that "[t]he exhaustion requirement is not a limit on the jurisdiction of the federal courts but rather, is a doctrine, arising from principles of federal-state comity restraining the appropriate exercise of that jurisdiction." Dirring v. Massachusetts, 459 F.2d 953, 955 (1st Cir.1972) (per curiam). See also Bowen v. Tennessee, No. 81–5386, slip op. at 2 (6th Cir. July 30, 1982).

The opinion in Rose does not indicate how its "total exhaustion" rule should be applied to cases caught in the time warp, i.e., cases decided by district courts prior to the date of Rose and pending on appeal after its effective date. Nor have the Court's subsequent decisions shed much light on this

---

2. Courts which have considered this issue differ as to the magnitude of the risk which the petitioner runs by amending the original habeas petition and filing a subsequent petition. Compare Powell v. Spalding, 679 F.2d 163, 165–66 n.2 (9th Cir.1982) (appellate court convinced that petitioner's subsequent habeas petition would not be barred by the abuse-of-the-writ doctrine) and Martin v. White, 538 F.Supp. 326, 327–28 (W.D.Mo.1982) (district court rejects argument that Rose requires the dismissal

of subsequent habeas petitions for abuse-of-the-writ in every case), with Jones v. Hess, 681 F.2d 688, 695–96 (10th Cir.1982) (petitioner warned that he runs the risk of forfeiting consideration of his unexhausted claims in federal court) and Fugett v. Marshall, 541 F.Supp. 293, 294–95 (S.D.Ohio 1982) (same). In light of our decision to examine the merits of petitioner's exhausted claims, we need not address the "substantial risk of forfeiture" issue.

issue. Since *Rose,* the Supreme Court has considered three cases presenting mixed habeas petitions. On March 8, 1982, five days after *Rose,* the Court remanded two cases to federal appellate courts with directions that these courts instruct the appropriate district court to dismiss the mixed habeas petition. *Duckworth v. Cowell,* 455 U.S. 996, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982); *Rodriguez v. Harris,* 455 U.S. 997, 102 S.Ct. 1627, 71 L.Ed.2d 858 (1982). In May of 1982, however, the Court remanded a mixed petition case to the circuit court "for further consideration" in light of *Rose. Bergman v. Burton,* —— U.S. ——, 102 S.Ct. 2026, 72 L.Ed.2d 478 (1982). This latest action may indicate that the Supreme Court does not feel that the *Rose* "total exhaustion" rule should automatically be applied to *all* cases pending at the time *Rose* issued.[3] We do not read these three cryptic Supreme Court opinions as compelling a dismissal of all mixed petition cases caught in the time warp.

Not surprisingly, the circuits are in disagreement as to how they should handle such cases. At least four circuits have adopted a policy of vacating the district court opinion and remanding to the district court with instructions to dismiss the mixed petitions. In *United States ex rel Clauser v. Shadid,* 677 F.2d 591, 594 (7th Cir.1982) (decided May 7, 1982), the Seventh Circuit vacated the district court judgment and remanded with directions to dismiss for lack of jurisdiction. In *Slotnick v. O'Lone,* 683 F.2d 60 (3d Cir.1982), the Third Circuit felt compelled by *Rose* to vacate the district court's denial of the writ. The court made the following observation: "The district court will undoubtedly see [the petitioner] again, and so will we. As an intermediate appellate court, however, we are not free to consider whether the burdens imposed by the *Rose v. Lundy* rule will be commensurate with the benefits articulated in its support by the Supreme Court." *Id.* at 61. Similarly, in *Jones v. Hess,* 681 F.2d

688, 694–96 (10th Cir.1982), the Tenth Circuit felt it must apply the "total exhaustion" rule despite petitioner's lengthy incarceration since 1971 and the possibility of further delay. In *Gulliver v. Dalsheim,* 687 F.2d 655 (2d Cir.1982), a panel of the Second Circuit sua sponte remanded a mixed petition to the district court for dismissal, amendment to delete unexhausted claims, or a determination that the petition had already been so amended, asserting that "[t]he Supreme Court has applied *Rose* retroactively." 687 F.2d at 657 n.2.

Two circuits, however, have chosen to review the exhausted claims on the merits despite *Rose.* In a recent opinion, the Sixth Circuit held that the "total exhaustion" rule would not be applied to cases where the *Rose* issue is raised for the first time on appeal. *Bowen v. Tennessee,* No. 81–5386, slip op. at 2–3 (6th Cir. July 30, 1982). Similarly, the Eighth Circuit has chosen to review the merits of mixed petitions in certain situations. The court described its practice as follows:

> We do not apply the total exhaustion rule here to a habeas case in which the exhausted claims had been fully litigated and decided in the federal district court prior to the *Lundy* decision. In our view it would constitute a great waste of judicial resources to apply *Lundy* retroactively and vacate the district court's determination on the merits. The end result of such a retroactive application of *Lundy* could require the federal district court and this court to reconsider these same claims at another time. This we decline to do without an express direction from the Supreme Court.

*Dunn v. Wyrick,* 679 F.2d 731, 733 (8th Cir.1982).

▪ We agree with the Sixth and Eighth Circuits and hold that *Rose* does not require a federal appellate court to decline review of a district court decision addressing the

---

**3.** We note that in Justice Stevens' dissent in *Bergman,* he states that "[n]othing in the Court's opinion in *Rose v. Lundy* or in anything the Court has written since, justifies the Court's reaching out on its own initiative to apply its new rule to previously decided cases." —— U.S. at ——, n. 4, 102 S.Ct. at 2028, n. 4 (Stevens, J., dissenting).

merits of the exhausted claims in a mixed petition when the district court opinion issued before *Rose* or was so close in time to *Rose* as to preclude consideration of it.

A number of reasons underlie our decision. First, *Rose* is phrased in prospective terms and does not appear to require retroactive dismissal of pending appeals in which the district court did not address the *Rose* issue. 455 U.S. at 520, 102 S.Ct. at 1204.

Second, *Rose* is concerned with reducing the burden on the federal courts. To require that exhausted claims decided without an awareness of *Rose* be subjected to a second, *de novo* trial in the district courts would be both a burden on the federal courts and a waste of judicial and litigant resources. We find the reasoning of the Sixth Circuit persuasive:

> There are unexhausted issues in many cases now pending in the federal appellate courts. In those cases the district courts have given considerable time, thought and energy to the disposition of the exhausted issues. In most the district court has denied the writ; in some it has granted the writ. To send all of those cases back to the district court for dismissal of the exhausted issues would add an unnecessary burden to the work of the district court. Most of the cases will have to be retried after the unexhausted issues are disposed of in the state courts.

*Bowen v. Tennessee,* slip op. at 3.

Third, petitioners who filed mixed habeas petitions before *Rose* announced the requirement of "total exhaustion" cannot be faulted for not meeting this new requirement. Prior practice in eight of the ten federal appellate circuits did not condition district court review upon a petitioner first having exhausted *all* claims contained in a mixed habeas petition. *See Rose v. Lundy,* 455 U.S. at 513, n.5, 102 S.Ct. at 1201, n.5 and cases cited therein. Those who filed mixed petitions before *Rose* issued should not be penalized for having followed the procedure that prevailed at the time.

Finally, the number of cases caught in the time warp is both finite and small. The problem will not exist for long.

We now proceed to a consideration of petitioner's five remaining exhausted claims.

II

Petitioner challenges two aspects of the state proceedings which resulted in his conviction. First, he alleges that the trial judge impermissibly limited the cross-examination of two key prosecution witnesses, resulting in a sixth amendment violation. Second, petitioner alleges that three particular jury instructions deprived him of a fundamentally fair trial in violation of his constitutional due process rights. Finally, petitioner alleges that the cumulative effect of all of the alleged errors violated his due process rights.

In reviewing a habeas petition, whether filed by a state or a federal prisoner, we are guided by the statutory mandate that such petitions be resolved "as law and justice require." 28 U.S.C. § 2243. The availability of federal habeas relief for a state prisoner, however, is more limited than for a federal prisoner. Under 28 U.S.C. § 2254(a), a state prisoner is entitled to federal habeas relief only when his or her custody is in violation of the Constitution, laws or treaties of the United States. Principles of comity dictate that a higher standard of cognizability be required of errors alleged by prisoners who are incarcerated as a result of state court proceedings. *Fasano v. Hall,* 615 F.2d 555, 557 (1st Cir.), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 86 (1980). Of course, state trial errors that render a fair trial impossible will be cognizable in federal habeas corpus, because such errors violate the due process clause. Many trial errors, however, are not of sufficient impact to constitute a denial of due process. *See, e.g., Bivens v. Wyrick,* 640 F.2d 179, 181 (8th Cir.1981) (prosecutor's improper cross-examination); *Allen v. Snow,* 635 F.2d 12, 14–15 (1st Cir.1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981) (prosecutor's reference to other fires on petitioner's property did not render petitioner's trial on arson

charges fundamentally unfair); *Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir.1981) (erroneous admission of hearsay); *Jacobs v. Redman,* 616 F.2d 1251, 1257 (3d Cir.), *cert. denied,* 446 U.S. 944, 100 S.Ct. 2170, 64 L.Ed.2d 799 (1980) (trial court's failure to ask questions proposed by defense counsel on voir dire, though troubling, did not rise to level of constitutional error).

The opinion of the Massachusetts Supreme Judicial Court, *Commonwealth v. Niziolek,* 380 Mass. 513, 404 N.E.2d 643 (1980), sets forth all of the facts upon which petitioner was convicted. Only a few facts need be repeated here to provide a context for the discussion of petitioner's claims.

Niziolek was convicted by a jury in the Superior Court of the Commonwealth of Massachusetts on six indictments—one for arson, one for burning insured property, and four for larceny over $100. On appeal, the Massachusetts Supreme Judicial Court reversed the arson conviction because of errors in the jury instructions but affirmed the other convictions. The court reversed petitioner's arson conviction based on the combination of three factors. First, the trial judge failed to give the jury any definition of the term "malice"—a necessary element of the crime of arson. The jury was thus required to speculate as to the legal meaning of the term "malice." Second, the trial judge instructed the jury that "[m]alice may be inferred from the wilful act of setting the fire or causing the fire to be set." The jury was thus allowed to draw an inference of malice without having that term defined for them. Third, the trial judge instructed the jury that "[a] person is presumed to intend the natural and probable consequence of his own acts." Viewing these three factors in combination, the Massachusetts Supreme Judicial Court concluded that "the jury instructions relative to the crime of arson were so flawed as to deprive the defendant of his due process right to be acquitted unless the Commonwealth proves every element of the crime beyond a reasonable doubt." *Id.* at 651–52.

The Massachusetts Supreme Judicial Court felt that the general instruction on intent apparently was meant to apply to all of the felonies with which petitioner Niziolek was charged. It concluded, however, that this instruction "did not fatally infect the respective charges on burning insured property and larceny ...." *Id.* at 651. The court gave two reasons for reaching this conclusion:

> First, the charges on those two crimes were not flawed by any definitional deficiency as was the arson charge. Second, the judge added an acceptable explanation of the intent requirement to his specific charges on burning insured property and larceny, which was conspicuously lacking from his charge on arson.

*Id.* at 651–52 (footnotes omitted).

At trial, the prosecution's main witness was Melvin Davis, who claimed to be the intermediary between Raymond Bednarz, the person allegedly used by the petitioner to hire an arsonist, and Norman Babineau, the arsonist who actually set fire to petitioner's house. Davis' testimony set forth a sequence of events resulting in the burning of petitioner's house in return for a $500 payment to the arsonist.

Kenneth Ingram, another prosecution witness, testified that petitioner on two occasions asked Ingram if he knew of anyone who would burn down his house.

While Davis was on the witness stand, defense counsel attempted to introduce the records of several of Davis' prior convictions. Included was Davis' conviction as an accomplice in the burning of petitioner's house. While Ingram was on the stand, defense counsel similarly sought to introduce the records of Ingram's convictions for two unrelated felonies. The trial judge excluded the records of criminal convictions of both witnesses, finding that they were inadmissible under Massachusetts law since neither witness had yet been sentenced. At a later point in the trial, the judge realized that he had erroneously excluded the records of convictions of both witnesses and allowed them to be introduced into evidence.

A third Commonwealth witness, Officer Dowd, introduced into evidence a pretrial

statement to the police made by petitioner. In the statement petitioner admitted that he had discussed with Bednarz the possibility of having his house burned. The statement goes on to say that petitioner did not make any specific arrangement to have his house burned.[4]

Bednarz, the petitioner's alleged agent for procuring an arsonist, was not called by either petitioner or the Commonwealth, although he was available to both parties.

## III

The sixth amendment to the United States Constitution guarantees the right of each criminal defendant to confront adverse witnesses.[5] This right of confrontation necessarily includes the right to cross-examine adverse witnesses. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347; *United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982). Two purposes are served by the constitutionally protected right of cross-examination: impeachment of a witness' credibility and exposure of a witness' biases and possible motives for testifying. *Davis v. Alaska,* 415 U.S. at 316, 94 S.Ct. at 1110; *United States v. Tracey,* 675 F.2d at 437.

A trial court is granted broad discretion in determining the scope and extent of cross-examination. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. Honneus,* 508 F.2d 566, 572 (1st Cir.1974), *cert.*

*denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). This discretion, however, is circumscribed by the sixth amendment. A trial court may limit cross-examination only after there has been permitted, as a matter of right, a certain threshold level of cross-examination which satisfies the constitutional requirement.

When a trial judge limits cross-examination as to possible witness bias or self-interest, the test for abuse of the judge's discretion is "whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness." *United States v. Tracey,* 675 F.2d at 437 (citations omitted). If the jury has sufficient evidence before it bearing on the witness' bias, "[t]he court need not permit unending excursions into each and every matter touching upon veracity . . . ." *United States v. Fortes,* 619 F.2d 108, 118 (1st Cir.1980). Once the constitutional threshold is satisfied, a trial court may exclude certain of the defendant's questions on cross-examination so as to restrict repetitive cross-examination and conjectural testimony. Such a limitation on cross-examination is not a denial of the constitutionally protected right of confrontation; rather it is a legitimate evidentiary ruling entrusted to the discretion of the trial judge. *Vanetzian v. Hall,* 433 F.Supp. 960, 963 (D.Mass.), *application for certificate of probable cause denied,* 562 F.2d 88 (1st Cir.1977).[6]

---

4. In relevant part, petitioner's pretrial statement reads:

> Sometime in October of 1976, I was talking with Ray Bednarz, he is the owner of Ray's Trucks on Parker St., I.O., about having my 3 family house torched . . . . In talking with Mr. Bednarz he thought he could find someone to do the job. I then left Ray's Trucks on Parker St. This was sometime in October. I never saw him or called him regarding having my house torched again.

5. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

6. Massachusetts state law concerning restrictions on cross-examination comports with the federal standards. It has recognized that crim-

inal defendants "are entitled, as of right, to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government. However, the trial judge still has discretion to control the scope of the examination." *Commonwealth v. Dougan,* 377 Mass. 303, 386 N.E.2d 1, 5 (1979) (citations omitted); *see also Commonwealth v. Best,* 381 Mass. 472, 411 N.E.2d 442, 452 (1980) (trial judge may reasonably control scope of cross-examination, "particularly, perhaps, when directed to showing a witness's bias"). A court-imposed limitation upon cross-examination of an adverse witness is not necessarily an infringement of the sixth amendment right to cross-examine "where the matters sought to be elicited have been sufficiently brought to the attention of the trier of fact through other ques-

Applying the above analysis to the facts of petitioner Niziolek's trial, we find that his right to confront and cross-examine prosecution witnesses was not violated. Although the trial judge initially excluded the records of convictions of Davis and Ingram, before the end of the trial he reversed his erroneous rulings and allowed them into evidence. Even before the conviction records were allowed into evidence, defense counsel, in the course of cross-examining Davis and Ingram, elicited the information that both witnesses were awaiting sentencing. Further, defense counsel was permitted to question Davis as to his motive for turning himself in to the police. This is nowhere near the total prohibition against inquiry into witness bias or motive that was present in *Davis v. Alaska,* 415 U.S. at 318, 94 S.Ct. at 1111. At most, petitioner's attorney was not allowed to probe as deeply as he might have liked into the two witnesses' motives for testifying. However, as this court recently stated in another habeas case, "the question is not whether some other judge might have been more flexible than the judge who handled the case but rather whether his ruling was so arbitrary as to violate the fundamental protections contained in the sixth amendment to the federal Constitution." *Blaikie v. Callahan,* 691 F.2d 64 at 69 (1st Cir.1982).

The trial judge's ruling was a reasonable exercise of the discretion granted to him. Petitioner's right to confront and cross-examine witnesses Davis and Ingram was not unconstitutionally restricted.

## IV

We turn now to the claim that the trial court judge on three occasions erroneously instructed the jury and thereby violated petitioner's due process rights to a fundamentally fair trial. While certain portions of the charge were, as the district court noted, expressed in "less than pellucid language," and other portions of the charge were better left unsaid, we find that the charge, as a whole, was fundamentally

sound. The flawed portions of the charge did not have a "sufficiently devastating impact," *Grace v. Butterworth,* 635 F.2d 1, 6 (1st Cir.1980), *cert. denied,* 452 U.S. 917, 101 S.Ct. 3053, 69 L.Ed.2d 421 (1981), on the trial to deny petitioner his due process rights.

As a general rule, improper jury instructions will not form the basis for federal habeas corpus relief. *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Instructions in a state trial are a matter of state law to which substantial deference is owed. In the exercise of our supervisory powers, we might well strike down a less than completely accurate jury instruction given by a federal district judge. We do not, however, exercise supervisory power over Massachusetts state courts. As the Supreme Court has stated, "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (footnote omitted).

In reviewing the habeas petition of a state prisoner our function ends when we determine that the challenged jury instructions violated no federal constitutional rights of the petitioner. In *Cupp v. Naughten,* the Supreme Court elaborated upon the role of a federal habeas court when reviewing a state jury instruction: "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. at 146, 94 S.Ct. at 400. And, as we recently explained:

> In upholding the challenged [state] charge we are not of course to be understood as particularly recommending it.

tioning or other means." *Commonwealth v. Walker,* 370 Mass. 548, 350 N.E.2d 678, 695

(citations omitted), *cert. denied,* 429 U.S. 943, 97 S.Ct. 363, 50 L.Ed.2d 314 (1976).

On a habeas corpus petition our task is done when we decide that the action of the state court was not contrary to the constitution. The choice among acceptable linguistic alternatives is for the [state] courts, not this court.

*Tsoumas v. New Hampshire,* 611 F.2d 412, 414 (1st Cir.1980).

We review the charge in light of the "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. at 146–47, 94 S.Ct. at 400.

The first challenged instruction stated:

Now, there are certain statements which are in evidence here that were allegedly made by the defendant which we in law call admissions and that is the statement that was introduced when Detective Dowd was on the stand and contains certain admissions made by this defendant concerning the matter for which he is now on trial. It's for you to determine, of course, whether or not, in fact, those admissions were made. At least the evidence is before you. An admission is a statement which is probably inconsistent with innocence. It's not a confession. A confession is an admission of all of the essential elements of the crime. So I'm not talking about a confession in any way. Whether there has been an admission is a question of fact to be found by the jury. If you find that this defendant at any time said anything or did anything which is inconsistent with his present claim of innocence, you have a right to consider this in deciding the question of his innocence or guilt and it's a piece of evidence which you construe and put together with all of the other evidence in this case in arriving at your ultimate verdict of guilty or innocent. So in the last analysis, an admission is an additional piece of evidence and has been defined as anything said or done which is inconsistent with his present claim of innocence. So apply that law if you find

some facts in this case upon which it is applicable.

Petitioner alleges that this instruction violated his sixth amendment right to have the jury determine the facts of his case; deprecated his credibility as a witness; assigned to him the burden of proving his "present claim of innocence"; and violated his due process rights by giving excessive significance to one piece of evidence.

We find no substance to any of these claims. The instruction did not saddle the petitioner with the burden of proving his "present claim of innocence" by disproving the assertion that his pretrial statement was an admission of guilt. Rather, the instruction attempted to clarify for the jury the distinction between an admission and a confession. Petitioner could only be helped by having a jury be made aware of this distinction. Further, the jury was left free to fulfill its fact-finding role in determining whether or not the pretrial statement was in fact an admission. The judge repeatedly stressed to the jurors that they, and not he, were to determine all factual questions raised by the evidence.

The next instruction at issue is: Now, as to the matter of a witness by the name of Raymond Bednarz, a potential witness in this case not appearing and testifying. You may draw a negative inference adverse to the defendant from the defendant's failure to call Raymond Bednarz as a witness for the defense. You are not compelled to do so. You may and that is for you to say, and by that I mean it's an inference that if Raymond Bednarz did testify, then he would testify adversely to the defendant.

This instruction is referred to as the "negative inference" instruction and is also called the "missing witness" instruction.

Petitioner claims that this instruction permitted the jury to draw an inaccurate and unreliable inference; usurped the fact-finding function of the jury; infringed his sixth amendment right to confront adverse witnesses; penalized his pretrial efforts to make Bednarz available as a witness; and

shifted to petitioner the burden of proving his innocence. The present state of Massachusetts law fully supports the use of the negative inference instruction in this case. *See Commonwealth v. Franklin,* 366 Mass. 284, 318 N.E.2d 469 (1974) and the cases cited therein. Further, the use of this instruction does not implicate any constitutional rights of petitioner.

The inference mentioned in the instruction was wholly permissive. *See County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979). The exact words used by the trial judge were: "You *may* draw a negative inference adverse to the defendant from the defendant's failure to call Raymond Bednarz as a witness for the defense. *You are not compelled to do so. You may and that is for you to say* ...." (emphasis added) No reasonable juror could have interpreted these words as mandating a finding that Bednarz' testimony, if given, would have been adverse to petitioner.[7]

The permissive nature of the negative inference undercuts petitioner's argument that the inference unconstitutionally shifted to him the burden of proving his innocence. As the Supreme Court has explained:

> The most common evidentiary device is the entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which *places no burden of any kind on the defendant.* ... Because this permissive presumption leaves the trier of fact free to credit or reject the inference and *does not shift the burden of proof,* it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.

*County Court of Ulster County v. Allen,* 442 U.S. at 157, 99 S.Ct. at 2224 (citations omit-

ted) (emphasis added). Looking to the evidence of petitioner's admitted conversation with Bednarz, and the testimony of Davis which further linked Bednarz and petitioner, the jury could easily and rationally have connected petitioner's failure to call Bednarz as a witness with petitioner's fear (or knowledge) that Bednarz, if called, would contradict petitioner's testimony.

■ Petitioner's inability to cross-examine Bednarz constitutes no violation of petitioner's sixth amendment right of confrontation. Bednarz cannot properly be labelled as an adverse witness, because at all times during the trial, the petitioner was free to call Bednarz as a witness. Neither the trial judge nor the Commonwealth did anything to impair Bednarz' availability as a witness. Indeed, the trial judge, before the end of the trial, specifically informed defense counsel that he would not instruct the jury that neither party was entitled to an inference concerning Bednarz' missing testimony. Defense counsel made a tactical decision not to call Bednarz as a witness. This cannot be converted on appeal into a violation of petitioner's constitutional right of confrontation.

■ We save until last, because we are most troubled by it, analysis of the following jury instruction.

> I would like to now discuss with you intent. Intent is a state of mind. The intention of a person cannot be determined by any machine yet invented by man but it is to be ascertained by his acts and the inference is to be drawn from what is externally visible. Intent ordinarily cannot be proven directly because there is no way of reaching into and examining the operations of the human mind, but you may determine the defendant's intent from any statement or act done or act omitted and all the other circumstances which indicate his state of mind, provided you first find that any or all of such circumstances occurred. <u>A person is presumed to intend the natural</u>

---

**7.** At two other points in the jury charge, the trial judge stressed that the jury, and not he, was to determine all facts, stating: "If you

believe that I have expressed or intimated any opinion as to the facts, you should disregard it."

and probable consequences of his own acts. For example, someone who strikes another with a hammer is presumed to intend the injury to the person being struck and someone who gives poison to another is presumed to intend the death of that person. (emphasis added)

Petitioner alleges that the underlined sentence is indistinguishable from the jury instruction found to be unconstitutional in *Sandstrom v. Montana,* 442 U.S. 510, 512, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 (1979) ("the law presumes that a person intends the ordinary consequences of his voluntary acts"). Looking solely to the emphasized sentence, we agree with the Massachusetts Supreme Judicial Court that " '[t]he words chosen by the judge came perilously close to establishing a presumption in favor of the Commonwealth which the defendant must overcome.' " *Commonwealth v. Niziolek,* 404 N.E.2d at 651 (quoting *Commonwealth v. Collins,* 374 Mass. 596, 373 N.E.2d 969 n.2 (1978)). Looking to the charge as a whole, however, and keeping in mind that we are reviewing a state court, we do not think that the use of this improper language fully reaches the level of constitutional error.

The trial judge began his charge by defining and explaining the presumption of innocence. This was followed by a discussion of the Commonwealth's burden to prove guilty beyond a reasonable doubt. The jury was instructed, *inter alia,* that "[t]here is no duty resting on the defendant to prove or otherwise establish his own innocence. Before there can be a conviction of the defendant, the Commonwealth must prove each and every element of the alleged crimes .... That is the burden of the Commonwealth." In the course of discussing petitioner's specific indictments, the trial judge stated "intent *may* be inferred from the circumstances or [*sic*] the setting of the fire." This is clearly a permissive inference. *See County Court of Ulster County v. Allen,* 442 U.S. at 157, 99 S.Ct. at 2224. Finally, the trial judge concluded his jury charge by reemphasizing petitioner's due process rights. "[Y]ou must consider at all times that the defendant is presumed innocent. That this presumption stands un-til you unanimously conclude that the Commonwealth has satisfied you of the defendant's guilt beyond a reasonable doubt as to each element of the crime."

A reasonable juror, listening to the jury charge in its entirety, could not have come away with the impression that petitioner bore the burden of proving his innocence. As this court has explained, "[a] reasonable juror can be expected to listen to all he/she is told by the judge and it will be presumed that he/she will not isolate a particular portion of the charge and ascribe to it more importance than the rest." *McInerney v. Berman,* 621 F.2d 20, 24 (1st Cir.), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 85 (1980).

■ Petitioner's final claim for relief is that the cumulative effect of the trial errors violated his constitutional right to due process of law. The answer is that there was no accumulation of errors. There were only two errors that skirted close to the defendant's constitutionally inviolate sanctuary. The trial judge corrected his initially mistaken ruling excluding the criminal record of two witnesses so that the defendant was not denied his right of cross-examination. This error was, therefore, eliminated at the trial level. We have found that the inappropriate use of the now proscribed "*Sandstrom*" instruction was not of constitutional magnitude.

The petition for writ of habeas corpus is denied.

*Affirmed.*